United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WESTPORT INSURANCE CORPORATION,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>VASQUEZ, ESTRADA AND CONWAY LLP,<br><br>　　　　Defendant. | Case No.  15-cv-05789-JST<br><br>**ORDER GRANTING IN PART AND DENYING IN PART COUNTER-DEFENDANTS' MOTION TO DISMISS**<br><br>Re: ECF No. 33 |

Before the Court is Counter-Defendants' Motion to Dismiss Counterclaims. ECF No. 33. The Court will grant in part and deny in part the motion.

## I.   BACKGROUND[1]

### A.   Parties

Defendant and Counter-Claimant Vasquez, Estrada & Conway LLP ("VEC") is a law firm in San Rafael, California that was founded in 2001. ECF No. 23 (Answer and Counterclaim) ¶ 8. The three equity partners of VEC, Michael A. Vasquez ("Vasquez"), Michael J. Estrada ("Estrada"), and Patricia Kantor Conway ("Conway"), are also Counter-Claimants in this action. Id. Counter-Defendants Westport Insurance Corporation ("Westport") and Swiss Re Corporate Solutions America ("Swiss Re") are insurance companies. Id. ¶¶ 9-10. Westport is a wholly owned subsidiary of Swiss Re. Id. ¶ 10. Westport and Swiss Re bring the instant motion to dismiss.

### B.   Factual Background

Vasquez has represented Hill Brothers Chemical Company ("Hill Brothers") in asbestos

---

[1] For the purpose of deciding the motion to dismiss, the Court accepts as true the following factual allegations from the Counterclaim, ECF No. 23.

1  litigation since 1996, while he was a partner at Long & Levit, LLP. Id. ¶ 12. Hill Brothers
2  followed Vasquez to his subsequent employer, Hinshaw & Culbertson, LLP. Id. In 2000,
3  Vasquez and Estrada established VEC (known at the time as Vasquez & Estrada) and Conway
4  joined in 2001. Id. ¶ 13. Hill Brothers, along with other clients, followed Vasquez, Estrada, and
5  Conway to VEC. Id.

6  Hill Brothers is an industrial chemical manufacturing company that, up until 1976,
7  manufactured asbestos-containing magnesite and blended asbestos. Id. ¶¶ 14–15. In the early
8  1990s, "Hill Brothers began being named as a defendant in California asbestos litigation." Id. ¶
9  15. By 2009, VEC states it defended Hill Brothers in nearly 200 cases. Id. "Hill Brothers made
10 a request to its [insurance] carriers that all California litigation be consolidated with VEC." Id.
11 This prompted "the transfer of Southern California-venued cases to the firm and the opening of
12 VEC's Glendale, CA office in February 2010." Id. ¶ 15. VEC also provided guidance to Hill
13 Brothers' out-of state cases. Id.

14 On April 30, 1980, Hill Brothers and Westport (then known as Puritan Insurance
15 Company) became parties to a "Multi-Line Liability Excess [Insurance] Policy" with liability
16 limits of $9.5 million. Id. ¶ 20. VEC alleges that the policy made Westport liable for legal costs
17 related to asbestos litigation but that Hill Brothers, and not Westport, had the right to select
18 counsel for Hill Brothers. Id. ¶¶ 21–22.

19 In July 2013, Westport's insurance policy with Hill Brothers was triggered, making
20 Westport responsible for funding the Hill Brothers' legal defense. Id. ¶ 23. At this time, Westport
21 shared responsibility for funding Hill Brother's defense with two other insurance carriers,
22 Resolute Management ("Resolute") and Fireman's Fund Insurance Company ("FFIC"). Id. VEC
23 alleges that pursuant to an inter-insurer agreement, Swiss Re agreed to pay 41.1% of the fees
24 billed and costs incurred by VEC and Resolute and FFIC were responsible for the remaining
25 58.9% of VEC's invoices for fees and costs. Id. ¶ 24.

26 In early August 2013, VEC submitted its July 2013 invoices, and in early September 2013,
27 VEC submitted its August 2013 invoices. Id. ¶ 25. Because VEC had not received payment from
28 Swiss Re, Vasquez wrote to inquire about the payment of the invoices. Id. ¶ 26.

In September 2013, Karen Chamberlain ("Chamberlain"), an Assistant Vice President with Swiss Re, advised Vasquez that bills for defense costs must be submitted through Tymetrix, Swiss Re's invoice payment and billing review system. Id. Chamberlain also informed Vasquez that VEC must enter into a "legal services contract" (the "Engagement Letter") with Swiss Re. Id. ¶ 26. Chamberlain sent Vasquez the Engagement Letter, which "set the terms for handling conflicts of interest, confidentiality, hourly rates, reporting and billing . . . ." Id. ¶ 29. Upon receiving the Engagement Letter, Vasquez told Chamberlain that VEC could not quarterly bill and requested that the firm be permitted to submit its invoices on a monthly basis. Id. ¶ 30. Chamberlain agreed to the change. Id. On September 19, 2013, Vasquez executed and returned the Engagement Letter to Chamberlain. Id. ¶ 33. On September 30, 2013, Chamberlain acknowledged receipt of the executed Engagement Letter. Id. ¶ 34.

In early November 2013, Vasquez wrote to let Chamberlain know that VEC's July, August, and September invoices had still not been paid. Id. ¶ 42. It was not until late March 2014 that VEC received final payments on its July, September – December invoices. Id. ¶ 46.

On August 2014, FFIC sent emails to Vasquez to advise him that Resolute had exhausted limits and could not pay VEC's July 2014 invoice or its share of the June 2014 invoice. Id. ¶ 51. FFIC also confirmed the new cost share percentages, retroactive to August 1, 2014: Swiss Re – 69.1% and FFIC – 30.9%. Id. Later in August, FFIC confirmed that the cost share change was retroactive to June 1, 2014. Id. ¶ 53. Chamberlain approved the cost share percentage changes on behalf of Swiss Re. Id. ¶ 54. On October 23, 2014, FFIC advised Hill Brothers' defense counsel that it exhausted its liability limits for the defense of Hill Brothers, and that after October 31, FFIC would no longer fund the defense of Hill Brothers but would fund a portion of settlement of claims made against the insured. Id. ¶ 55. Swiss Re became the sole remaining carrier, and VEC began billing Swiss Re for 100% of the fees and costs incurred from November 1, 2014 onward. Id. ¶ 56.

In fall of 2014, VEC noticed shortfalls in its receivables from the Hill Brothers account. Id. ¶ 64. On October 28, 2014, Vasquez emailed Chamberlain and provided her with a ledger card showing that Swiss Re owed VEC $861,840.27 through September 2014. Id. ¶ 65. Vasquez

3

received no response. Id. ¶ 66. Three days later, Vasquez again emailed Chamberlain about the outstanding ledger, which had now increased to $911,457.66. Id. ¶ 66. Chamberlain emailed Vasquez that Swiss Re had no outstanding payments to VEC and that its payment for September 2014 was on its way. Id. ¶ 67. On November 25, 2014, Vasquez responded and informed Chamberlain that Swiss Re's payments did not account for its increased share for Hill Brothers' legal costs. Id. ¶ 68. In early December, Vasquez wrote to Chamberlain again about the outstanding payments, but Chamberlain reiterated that Swiss Re was up to date on its payments. Id. ¶ 76. VEC made further unsuccessful attempts to discuss the issue with Chamberlain on December 10 and 12, 2014 and January 4, 2015. Id. ¶¶ 77–78, 80.

On January 20, 2015, VEC learned through Tymetrix that Swiss Re had taken large deductions from invoices without specific explanations or reasons that contradicted prior instructions. See id. ¶¶ 81–85. On February 13, 2015, Chamberlain agreed to expedite payment for unpaid portions of the April–July 2014 invoices. Id. ¶ 99.

On February 26, 2015, VEC wrote to Chamberlain that Swiss Re's continued non-payment had "resulted in a crisis situation" and "some vendors had told VEC that no further services would be provided until they were paid." Id. ¶ 101. On February 27, 2015, Chamberlain denied her prior representation for expedited payments. Id. ¶ 102.

By March 3, 2015, VEC reported to Hill Brothers that it "had essentially no money to advance for Hill Brother[s'] defense, pending payment by [Swiss Re]." Id. ¶ 105. On March 7, 2015, Hill Brothers loaned "VEC $475,000 to enable VEC to continue with Hill Brother[s]' defense." Id. ¶ 106.

On March 18, 2015, Hill Brothers advised Vasquez "that it was being pressured by [Swiss Re] to replace VEC as defense counsel. [Swiss Re] cited Hill Brothers to a report prepared by the Foreman firm as the result for wanting to replace VEC." Id. ¶ 108. Hill Brothers did not change defense counsel. Id.

On March 20, 2015, Vasquez continued to contact Chamberlain about Swiss Re's outstanding payments. Id. ¶ 109. Chamberlain replied on March 24, 2015 and alleged that "the Foreman report revealed 'egregious examples of overbilling practices' and 'lack of substantive

work product' that raised 'serious concerns regarding [VEC's] defense of Hill Brothers.'" Id. When Vasquez asked to discuss these allegations, Chamberlain did not respond. Id. ¶ 110.

On March 31, 2015, Vasquez informed Chamberlain by email of the consequences of Swiss Re's withholding of payment, including wage penalties, employee layoffs, inability to defend Hill Brothers, and other personal liabilities for the firm's obligations. See id. ¶ 114. On April 3, 2015, Chamberlain responded that all VEC invoices had been paid through November 2014. Id. ¶ 118. Chamberlain also offered that it would pay the April–July 2014 invoices if VEC agreed to a 60% reduction of the sums owed. Id. ¶ 119.

By April 8, 2015, VEC laid off eight attorneys, two paralegals, and six staff personnel without being able to provide final paychecks, accrued time off, and other amounts owed. Id. ¶ 126. On April 9, 2015, Hill Brothers forwarded to Vasquez an email from Chamberlain wherein she represented that VEC would receive $200,000 by April 14. Id. ¶ 128. However, on April 14, 2015, VEC received a wire transfer from Swiss Re for only $13,682.85 and never received the remaining $186,000.00. Id. ¶¶ 129, 131.

On April 17, 2015, VEC "laid-off its remaining employees with the exception of two associates, one paralegal, one secretary and one other staff member. VEC was unable to provide all these laid-off employees with their final paychecks, accrued time off, earned bonuses, etc." Id. ¶ 132. That same day, Swiss Re told Hill Brothers that it "had a fraud case against [VEC]." Id. ¶ 133.

Shortly after April 17, 2015, VEC began transferring files for Hill Brothers to the new defense counsel, Morgan Lewis & Bockius LLP. Id. ¶ 134. Seven weeks later, Westport sent VEC a check for "$1,030,219.29, in satisfaction of certain VEC fees, exclusive of costs." Id. ¶ 142.

**C.     Procedural Background**

On May 15, 2015, Westport filed a petition with the Los Angeles County Bar Association for mandatory fee arbitration and served that petition on VEC. Id. ¶ 139. On September 29, 2015, Westport's counsel was relieved as counsel because of a conflict of interest. Id. ¶ 144. By October 5, 2015, Westport withdrew and dismissed its arbitration demand. Id. ¶ 145.

On October 6, 2015 Westport filed the Complaint against VEC for (1) breach of contract; (2) breach of the covenant of good faith and fair dealing; (3) declaratory relief that Westport had no further payment obligation to VEC; and (4) an accounting. ECF No. 1. Westport alleges that between May 2013 and April 2015, VEC invoiced the insurers more than $9 million for attorneys' fees and costs incurred in defending Hill Brothers. Id. ¶ 1. "Westport's share of these invoices was $6,022,744.11, of which Westport has already paid $5,028,234.04." Id. Westport seeks to recover over $2 million attributed to VEC's mismanagement and excessive billing. Id. ¶ 3. Westport also seeks a declaratory judgment that Westport has no further payment obligation and an accounting.

On January 5, 2016, VEC filed its Answer; and VEC, Vasquez, Estrada, and Conway filed their Counterclaim. ECF No. 23. The Counterclaim seeks relief against Westport and Swiss Re for (1) breach of contract; (2) breach of the covenant of good faith and fair dealing; (3) quantum meruit; (4) fraud; (5) negligent misrepresentation; (6) defamation; (7) intentional interference with contractual relationship; and (8) intentional interference with prospective business advantage. Additionally, Vasquez and Estrada allege a claim for (9) intentional infliction of emotional distress. Counter-Claimants seek at least $1.2 million for uncompensated legal services and at least $11.5 million for consequential damages. Id. ¶¶ 152–153.

On February 19, 2016, Westport and Swiss Re filed the instant motion to dismiss, seeking to dismiss the counterclaims for (1) fraud; (2) negligent misrepresentation; (3) defamation; (4) intentional interference with contractual relationship; (5) intentional interference with prospective business advantage; (6) intentional infliction of emotional distress; (7) and all claims as to Swiss Re. ECF No. 33. Westport and Swiss Re argue that this case is merely a breach of contract case regarding a fee dispute that Counter-Claimants seek to transform into a tort case. See ECF No. 33 at 14.[2]

### D. Jurisdiction

The Court exercises jurisdiction pursuant to 28 U.S.C. § 1332 and 28 U.S.C. § 1367(a).

---

[2] Citations are to the pages assigned by the Court's electronic case filing system and not to the internal pagination of the document.

## II. LEGAL STANDARD

A motion to dismiss a counterclaim brought pursuant to Rule 12(b)(6) is evaluated under the same standard as motion to dismiss a plaintiff's complaint. On a Rule 12(b)(6) motion to dismiss, the Court accepts the material facts alleged by the non-moving party together with all reasonable inferences to be drawn from those facts, as true. Navarro v. Block, 250 F. 3d 729, 732 (9th Cir. 2001). However, "the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, the party asserting a claim must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). Plausibility does not mean probability, but it requires "more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 687.

In addition, fraud claims are subject to a heightened pleading standard. "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The allegations must be specific enough to give a defendant notice of the particular misconduct alleged to constitute the fraud such that the defendant may defend against the charge. Semegen v. Weidner, 780 F. 2d 727, 731 (9th Cir. 1985). In general, allegations sounding in fraud must contain "an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." Swartz v. KPMG LLP, 476 F. 3d 756, 765 (9th Cir. 2007). However, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

## III. DISCUSSION

### A. Fraud and Negligent Misrepresentation

Under California law, the elements of fraud are: (1) misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (or "scienter"); (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage. Kearns v. Ford Motor Co., 567 F.3d 1120, 1126 (9th Cir. 2009). The elements of negligent misrepresentation are (1) the misrepresentation of a past or existing material fact; (2) without

7

reasonable ground for believing it to be true; (3) with intent to induce another's reliance on the fact misrepresented; (4) justifiable reliance on the misrepresentation; and (5) resulting damage. Apollo Capital Fund, LLC v. Roth Capital Partners, LLC, 158 Cal. App. 4th 226, 243 (2007). "In contrast to fraud, negligent misrepresentation does not require knowledge of falsity." Id. Instead, "[a] person who makes false statements, honestly believing that they are true, may still be liable for negligent misrepresentation if he or she has no reasonable grounds for such belief." Id. (internal quotations omitted).

The economic loss rule, however, bars a party from bringing tort claims in a breach of contract action for pure economic loss "unless [the purchaser] can demonstrate harm above and beyond a broken contractual promise." Robinson Helicopter Co. v. Dana Corp., 34 Cal. 4th 979, 988 (2004) (citations omitted). This means that "[c]onduct amounting to a breach of contract becomes tortious only when it also violates a duty independent of the contract arising from principles of tort law." Id. at 988 (quoting Erlich v. Menezes, 21 Cal. 4th 543, 441 (1999)). This rule also applies to a breach of a tort duty apart from the general duty not to act negligently. Id. at 989; see also United Guar. Mortg. Indem. Co. v. Countrywide Financial Corp., 660 F. Supp. 2d 1163, 1181–82 (C.D. Cal. 2009). The economic loss rule is designed to "prevent[ ] the law of contract and the law of tort from dissolving one into the other." Robinson Helicopter, 34 Cal. 4th at 988.

Westport and Swiss Re contend that the economic loss rule bars VEC's claims for fraud and negligent misrepresentation because these claims only restate VEC's breach of contract claim. ECF No. 33 at 16

VEC principally relies on Robinson Helicopter Co. v. Dana Corp. for the proposition that the economic loss rule does not apply when the breach of contract either (1) involves tortious conduct independent from the contractual breach or (2) when the tortious conduct exposes the plaintiff to personal liability independent of the plaintiff's economic loss. ECF No. 49 at 15–16.

In Robinson Helicopter, the plaintiff Robinson, a helicopter manufacturer, sued defendant Dana, a helicopter parts supplier, for fraud and intentional misrepresentation after discovering that Dana had provided Robinson with false certificates of conformance and that Dana's faulty

8

products had exposed Robinson to "liability for personal damages if a helicopter crashed and to disciplinary action by the" Federal Aviation Administration. Robinson Helicopter, 34 Cal. 4th at 991. The court held that Dana's provision of false certificates of conformance was independent of Dana's breach of contract, because the breach itself involved the sale of faulty clutches and Dana's issuance of the certificates exposed Robinson to liability for personal damages. Id. at 991–92. The Robinson court explicitly limited its "narrow" holding to "a defendant's affirmative misrepresentations on which a plaintiff relies and which expose a plaintiff to liability for personal damages independent of the plaintiff's economic loss." Id. at 993.

      Here, VEC alleges that Westport's false promises to pay VEC's outstanding invoices support claims for fraud and negligent misrepresentation. ECF No. 23 ¶¶ 165–90. Similarly, VEC's breach of contract claim relies on Westport's failures to pay VEC's invoices. ECF No. 23 ¶ 151. VEC claims that Westport's false promises were independent of the breach itself and exposed VEC to liability for personal damages for (1) sudden layoffs in violation of California law; (2) an outstanding loan from Hill Brothers; (3) outstanding bills to experts, court reporters, and other vendors; and (4) failing to meet its independent duties to Hill Brothers. ECF No. 49 at 17.

      The Court declines to apply the Robinson Helicopter exception from the economic loss rule to VEC's fraud-based counterclaims for four reasons. First, Westport's alleged false promises to pay are directly related to Westport's alleged failure to pay, which is the basis for VEC's breach of contract claim. Second, VEC admits that its exposure to liability for "personal damages" is the direct result of Westport's failure to pay. As VEC alleges in its fraud claim:

> VEC was . . . damaged by [Swiss Re]'s false promises of payment in that it was deprived of the value of the January – April 2015 invoices and was induced to advance and/or assume responsibility for costs associated with the defense of Hill Brothers. VEC was also damaged in that . . . the firm had insufficient funds to pay all final paychecks for the laid off employees. The failure to timely pay final paychecks in full subjects VEC to waiting time and other statutory penalties under the California Labor Code.

ECF No. 23 ¶ 179. VEC does not allege that liability for "personal injury or damages to other property." Robinson Helicopter, 34 Cal. 4th at 991 n.7. Instead, the third party liability for

personal damages that VEC alleges is the same economic loss that it alleges in its breach of contract claim. Compare ECF No. 23 ¶¶ 152–153 (damages for contract claim) with id. ¶¶ 179–180. VEC does not allege conduct that is "independent from the various promises made by the parties in the course of their contractual relationship." Oracle USA, Inc. v. XL Global Services, Inc., No. C 09-00537 MHP, 2009 WL 2084154, at *4 (N.D. Cal. July 13, 2009).

Third, it is unclear whether the Robinson exception applies outside of the products liability context. See United, 660 F. Supp. 2d at 1183 ("Robinson Helicopter's repeated references to the products liability version of the rule, its emphasis on the particular goods at issue, and its expressly 'narrow' and 'limited' holding, have led at least one other federal court to question whether the Robinson Helicopter analysis can apply to contracts other than those for goods."); JMP Sec. LLP v. Altair Nanotechnologies Inc., 880 F. Supp. 2d 1029, 1043 (N.D. Cal. 2012) ("[T]his Court, like others in California, doubts that Robinson Helicopter has any application outside the products liability context in which it was decided."); Oracle USA, Inc., 2009 WL 2084154, at *6 ("Robinson Helicopter was a products liability case, and the court's reasoning suggests that the holding applies only to such cases.").

Finally, even if Robinson Helicopter applied to the instant action, policy considerations do not favor applying an exception to the economic loss rule. Courts "enforce the breach of a contractual promise through contract law, except when the actions that constitute the breach violate a social policy that merits the imposition of tort remedies." Robinson Helicopter, 34 Cal. 4th at 991–92 (quoting Freeman & Mills, Inc. v. Belcher Oil Co., 11 Cal. 4th 85, 107 (1995)). Here, Westport and Swiss Re's alleged conduct is not so clearly violative of business practices, and VEC does not otherwise allege how the conduct breached a duty imposed by law beyond their breach of contract and breach of the covenant of good faith and fair dealing.

As presently alleged, Counter-Claimants fourth and fifth causes of action for fraud and negligent misrepresentation against Westport and Swiss Re fall within the scope of the economic loss rule. Accordingly, these claims are dismissed with leave to amend.

**B.     Defamation**

"Defamation is an invasion of the interest in reputation. The tort involves the intentional

publication of a statement of fact which is false, unprivileged, and has a natural tendency to injure or which causes special damage." Ringler Associates Inc. v. Maryland Cas. Co., 80 Cal. App. 4th 1165, 1179 (2000). "Publication, which may be written or oral, is defined as a communication to some third person who understands both the defamatory meaning of the statement and its application to the person to whom reference is made." Id. Publication to a single individual is sufficient to satisfy the publication element of a defamation claim. Id.

"[D]efamation is statutorily defined as an *unprivileged* communication . . . ." Brown v. Kelly Broadcasting Co., 48 Cal.3d 711, 724 n.7 (1989) (emphasis in original). Under California Civil Code § 47(c), a privileged communication is one made:

> In a communication, without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such a relation to the person interested as to afford a reasonable ground for supposing the motive for the communication to be innocent, or (3) who is requested by the person interested to give the information.

"To defeat this conditional privilege, a plaintiff must specifically allege malice. However, a general allegation of malice will not suffice; plaintiff must allege detailed facts showing defendant's ill will towards him." Jones v. Thyssenkrupp Elevator Corp., No. C-05-3539 EMC, 2006 WL 680553, at *6 (N.D. Cal. Mar. 14, 2006) (citations omitted). Defamation is not subject to the heightened pleading standard of Rule 9(b); however, Counter-Claimants still must allege facts sufficient to state a "plausible claim for relief." See Kennedy Funding, Inc. v. Chapman, No. C 09-01957 RS, 2010 WL 4509805, at *5 (N.D. Cal. Nov. 1, 2010).

Westport and Swiss Re contend that Counter-Claimants have failed to adequately identify and state the substance of the alleged defamatory statement and that the allegedly defamatory statement is privileged. ECF No. 33 at 22–23.

Counter-Claimants allege that Westport and Swiss Re made a defamatory statement when, "[o]n April 17, 2015, in a communication with Hill Brothers related to the status of payment of the outstanding sums owed to VEC, [Swiss Re] told Hill Brothers that it 'had a fraud case against Vasquez Estrada & Conway.'" ECF No. 23 ¶ 195. This statement was "uttered" "for the purpose of countering Hill Brothers' pressure on Counter-Defendants to pay VEC's legitimate billing and

11

to convince Hill Brothers to end its relationship with Counter-Claimants." Id. ¶ 196.

Counter-Claimants have specifically identified the time, context, form of communication, and substance of the allegedly defamatory statement. Although the subject of the defamatory statement is of mutual interest to Swiss Re and Hill Brothers, as both parties are affected if VEC did in fact fraudulently bill, Counter-Claimants have sufficiently alleged malice. Counter-Claimants allege that the statement was made to end VEC's attorney-client relationship with Hill Brothers. Counter-Claimants allege that Hill Brothers had received pressure by Swiss Re to replace VEC as defense counsel. See ECF No. 23 ¶ 108. That VEC eventually withdrew as counsel for Hill Brothers reinforces the malicious purpose alleged.

Because Counter-Claimants have sufficiently pleaded the elements of defamation, the Court denies the motion to dismiss the defamation claim.

### C. Intentional Interference with Contractual Relations

Under California law, the elements for the tort of intentional interference with contractual relations are "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." United Nat. Maintenance, Inc. v. San Diego Convention Ctr., Inc., 766 F.3d 1002, 1006 (9th Cir. 2014) (citing Pac. Gas & Elec. Co. v. Bear Stearns & Co., 50 Cal. 3d 1118, 1126 (1990)).

In an action for intentional interference with contractual relations, the plaintiff and defendant may not both be parties to the contract in question. Applied Equip. Corp. v. Litton Saudi Arabia Ltd., 7 Cal.4th 503, 514 (1994). Otherwise a plaintiff could improperly recast contract claims as tort claims. See id. at 514–17. The California Supreme Court expressed this rule as: "One contracting party owes no general tort duty to another not to interfere with performance of the contract; its duty is simply to perform the contract according to its terms. The tort duty not to interfere with the contract falls only on strangers—interlopers who have no legitimate interest in the scope or course of the contract's performance." Id. at 514. As to noncontracting parties, "California recognizes a cause of action against noncontracting parties who

12

1    interfere with the performance of a contract." Id. at 513. "A 'stranger,' as used in Applied
2    Equipment, means one who is not a party to the contract or an agent of a party to the contract."
3    Asahi Kasei Pharma Corp. v. Actelion Ltd., 222 Cal. App. 4th 945, 964 (2013); see also United
4    Nat. Maint., Inc., 766 F.3d at 1008.

5    VEC alleges that Westport and Swiss Re interfered with VEC's attorney-client
6    relationship with Hill Brothers. Westport and Swiss Re argue that the claim for intentional
7    interference with contractual relations is barred, as a matter of law, because Westport is not a
8    stranger to VEC's attorney-client contract with Hill Brothers. ECF No. 33 at 24. Westport
9    contends that "by virtue of the Westport policy and engagement letter, Westport was part of the
10   attorney, client-insurer and client-insured relationship." ECF No. 53 at 16.

11   The Counterclaim in the instant action alleges that "[t]he absence of a 'duty to defend/right
12   to defend' provision in [Westport's] indemnity policy means that the insured, Hill Brothers, and
13   not the insurer, had the right to choose the attorney who would act as defense counsel for claims
14   asserted against Hill Brothers." ECF No. 23 ¶ 22. The Counterclaim goes on to describe the
15   Engagement Letter VEC entered into with Swiss Re and Westport. Id. ¶¶ 27–31. The letter notes
16   that VEC is "instructed to act for Swiss Re, including all of its affiliates, in connection with Hill
17   Brothers." Id. ¶ 27.

18   The contract with which Westport and Swiss Re allegedly interfered was the contract for
19   legal services between VEC and Hill Brothers. Counter-Claimants do not allege that Westport and
20   Swiss Re were parties to that contract, and Westport and Swiss Re cite no authority holding
21   otherwise.

22   Westport and Swiss Re, however, argue that "they are not merely 'noncontracting parties'
23   or 'third-parties' who only enjoy an economic interest in the VEC-Hill Brothers relationship."
24   ECF No. 53 at 15. Westport and Swiss Re attempt to distinguish this case from Powerhouse
25   Motorsports Grp., Inc. v. Yamaha Motor Corp., where the appellate court held that a manufacturer
26   may be liable for interference with a sales contract between a franchise operator and a potential
27   new owner. 221 Cal.App.4th 867, 883–84 (2013). In reaching this holding, the Powerhouse court
28   observed that Applied Equipment applied the intentional interference with contractual relations

13

tort to non-contracting parties and declined to extend the holding of Applied Equipment to include the manufacturer who may have had a "legitimate interest in the scope or course of the contract's performance." Id.

Westport and Swiss Re emphasize the "unique circumstances in this case" to argue that their interest in the defense of Hill Brothers makes them a party to the attorney-client contract in a way that the mere economic interest of the alleged tortfeasor in Powerhouse could not. See ECF No. 53 at 15. They cite to Bank of America v. Superior Court of Orange Cty., 212 Cal. App. 4th 1076 (2013), to support their argument that "the three parties – the attorney, client-insured and client-insurer – 'may be viewed as a loose partnership, coalition or alliance direct towards a common goal' and, together, comprise 'a unitary whole with . . . reciprocal obligations and duties each to the other . . . .'" ECF No. 53 at 16 (citing Bank of America, 212 Cal. App. 4th at 1090-21).

This observation is a far cry from holding that the insurer, the insured, and the insured's attorneys are all invariably parties to the same contract, and with good reason: the Bank of America case contains no such holding. In that case, the question before the court was whether an insurer could assert the attorney-client privilege with regard to communications between itself and its insured's lawyer. Bank of America, 212 Cal. App. 4th at 1084. The court held that because of the overlapping relationship between the carrier, insured, and attorney, the attorney has two clients for purposes of the privilege – the insured and the carrier. Id. at 1096. But the Bank of America court had no reason to consider, much less hold, whether the insurer was actually a party to the specific contract between lawyer and client.[3] And VEC stresses that the policy permitted Hill Brothers to choose its defense counsel, and that it was Hill Brothers – not Westport – who retained VEC.

Westport and Swiss Re are not parties to VEC's retainer agreement. This Court declines to expand the holding of Applied Equipment to include Westport and Swiss Re as parties to the

---

[3] The court did observe that, "*[c]onceptually*, each member of the trio, attorney, client-insured, and client-insurer has corresponding rights and obligations founded largely on contract, and as to the attorney, by the Rules of Professional Conduct as well." Bank of America, 212 Cal. App. 4th at 1090 (emphasis added). That someone's duties might arise from the same conceptual base as the law of contract is very different from saying that he or she is a party to a contract.

14

contract. See, e.g., Powerhouse Motorsports Grp., 221 Cal. App. 4th at 884. Westport and Swiss Re's motion to dismiss the intentional interference with contractual relations claim is denied.

### D.  Intentional Interference with Prospective Business Advantage

To plead a claim for intentional interference with prospective business advantage, a plaintiff must allege: (1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant. Korea Supply Co. v. Lockheed Martin Corp., 29 Cal. 4th 1134, 1153.

"To state a claim for intentional interference with prospective economic advantage . . . a plaintiff must allege that the defendant's conduct was 'wrongful by some legal measure other than the fact of the interference itself.' 'An act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard.'" Arthur J. Gallagher & Co. v. Lang, No. C 14–0909 CW, 2014 WL 6816644, at *3 (N.D. Cal. Dec. 3, 2014) (quoting Korea Supply Co., 29 Cal. 4th at 1153, 1159 (2003)). A plaintiff may rely on separate claim for relief, such as fraud, as the basis for an "independently wrongful act, but only if it is adequately pled." UMG Recordings, Inc. v. Global Eagle Entertainment, Inc., 117 F. Supp. 3d 1092 (C.D. Cal. 2015) (citing BioResource, Inc. v. U.S. PharmaCo Distribution, Ltd., No. CV10–01053 SI, 2010 WL 3853025, at *3 (N.D. Cal. Sept. 29, 2010).

Westport and Swiss Re contend that VEC cannot state a claim for intentional interference with prospective business advantage because VEC does not allege independently wrongful conduct and because VEC does not allege facts showing that a prospective contract had been disrupted. ECF No. 33 at 25–26.

VEC alleges independently wrongful conduct, including fraud, negligent misrepresentation, and fraud.  ECF No. 23 ¶¶ 210–217.  Although the Court dismissed the claims for fraud and negligent misrepresentation, the Court did not dismiss the defamation claim. On this basis, VEC has adequately alleged facts showing independent wrongful conduct.

VEC next responds that its long-term relationship with Hill Brothers readily demonstrates prospective business advantage. VEC has alleged a long-standing attorney-client relationship with Hill Brothers and have stated additional facts to bolster this contention. Vasquez began representing Hill Brothers in 1996. ECF No. 23 ¶ 12. Hill Brothers followed Vasquez, Estrada, and Conway when the attorneys changed firms and again when the attorneys started VEC. Id. ¶¶ 12–13. Hill Brothers loaned VEC $475,000 to enable VEC's continued defense of Hill Brothers. Id. ¶ 106. Although Hill Brothers has the right to discharge its attorneys at any time with or without cause, Counter-Claimants have plausibly alleged facts to support the probability of future economic benefit.

The Court denies the motion to dismiss the eighth claim for intentional interference with prospective business advantage.

### E.  Intentional Infliction of Emotional Distress

Under California law, a cause of action for intentional infliction of emotional distress exists when there is (1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiffs suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct. Hughes v. Pair, 46 Cal. 4th 1035, 1051 (2009). "A defendant's conduct is outrageous when it is so extreme as to exceed all bounds of that usually tolerated in a civilized community. And the defendant's conduct must be intended to inflict injury or engaged in with the realization that injury will result." Id. (internal citations and quotation marks omitted).

Westport and Swiss Re first argue that Vasquez and Estrada cannot recover emotional distress damages, because the claim is barred by the economic loss rule. ECF No. 33 at 26–27. However, this argument is mistaken. California courts only apply the economic loss rule to bar claims for negligent infliction of emotional distress when there is no accompanying property damage. See Ragland v. U.S. Bank Nat. Assn., 209 Cal. App. 4th 182, 203 (2012) ("The rule does not apply to intentional infliction of emotional distress . . . .").

Westport and Swiss Re next argue that Vasquez and Estrada fail to state a plausible claim

for intentional infliction of emotional distress, because they have not adequately alleged extreme and outrageous conduct. ECF No. 33 at 27. "Conduct, to be outrageous must be so extreme as to exceed all bounds of that usually tolerated in a civilized society." Huntingdon Life Sciences, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc., 129 Cal. App. 4th 1228, 1259 (2005) (internal citations and quotation marks omitted). As examples of Westport and Swiss Re's allegedly extreme and outrageous behavior, Vasquez and Estrada allege that Swiss Re harmed them by its "delay and non-payment of VEC's invoices," "deceptive and fraudulent misrepresentations regarding the payment of those invoices," and "its false accusations and insinuations to Hill Brothers of 'problems' and 'mishandling' of case work by VEC . . . ." ECF No. 23 ¶ 219.

This behavior is similar to the conduct described in Unterberger v. RedBull N. Am., 162 Cal. App. 4th 414 (2008). In that case, plaintiff beverage distributors sued RedBull based on the termination of plaintiffs' right to distribute RedBull products in the Caribbean. Id. at 419. Plaintiffs "claimed that [RedBull]'s 'change in credit terms to bring extreme financial pressure on plaintiffs to quit, and then refusing to ship the paid for product anyway, meaning we obviously would not be able to service our customers even though we arranged costly emergency financing, would necessarily and naturally result in emotional distress to the intended victims . . . ." Id. at 423. The Court of Appeal affirmed a grant of summary judgment for RedBull, finding that RedBull's conduct was not "so extreme and outrageous as to permit recovery." Id. The court stated that "the termination of a business relationship, is, as [a] matter of law, not the type of 'outrageous' conduct that is required to support a cause of action for intentional infliction of emotional distress." Id. The Court applies Unterberger here and concludes that the facts alleged in the Counterclaim will not support a claim for intentional infliction of emotional distress.

Vasquez and Estrada's ninth cause of action for intentional infliction of emotional distress is dismissed with leave to amend.

### F. All Claims against Swiss Re

Westport and Swiss Re argue that "the Counterclaim should be dismissed in its entirety as against Swiss Re because it fails to allege any facts supporting that Swiss Re was liable for any of the conduct alleged therein." ECF No. 33 at 29. They contend that the only allegations in the

17

Counterclaim against Swiss Re "arise solely from Swiss Re's status as Westport's parent company." Id. at 30.

Westport and Swiss Re rely on Yamuachi v. Cotterman, 84 F.Supp.3d 993 (N.D. Cal. 2015), for the proposition that failing to distinguish between Westport and Swiss Re warrants dismissal of Swiss Re. See ECF No. 53 at 20. However, Yamauchi is inapposite because it addresses the plaintiff's claims under the heightened pleading standard of Rule 9(b) and not Rule 12(b)(6). There, the plaintiff failed to identify the role each defendant had in the allegedly fraudulent scheme. Yamuachi, 84 F.Supp.3d at 1019.

In the instant case, Counter-Claimants adequately allege facts to support that Swiss Re engaged in acts apart from its status as Westport's parent corporation. For instance, the Counterclaim extensively alleges the actions taken by Swiss Re's Assistant Vice President, Karen Chamberlain. ECF No. 23 ¶ 26. Counter-Claimants further specify that VEC's Engagement Letter was with Swiss Re (id. ¶ 27); VEC's relationship with Westport was conducted through Ms. Chamberlain at the direction of Swiss Re (id. ¶¶ 28, 34); and Ms. Chamberlain identified herself as Assistant Vice President of Swiss Re (id. ¶ 28). See ECF No. 49 at 29–30 (citing ECF No. 23 ¶¶ 26–37, 45, 67, 71, 74, 76, 98-99, 102–103, 109–115, 118–119, 121–123, 125, 128–129).

The Court denies the motion to dismiss all claims as to Swiss Re.

## CONCLUSION

The Court grants in part and denies in part Westport and Swiss Re's motion to dismiss. The claims for fraud, negligent misrepresentation, and intentional infliction of emotional distress are dismissed with leave to amend. The claims for defamation, intentional interference with contractual relationship, intentional interference with prospective business advantage, and all claims against Swiss Re are not dismissed.

/ / /

/ / /

/ / /

/ / /

/ / /

1   Counter-Claimants may file an amended Counterclaim within 21 days of the date of this
2  Order.
3   IT IS SO ORDERED.
4  Dated: April 8, 2016

_____
JON S. TIGAR
United States District Judge